F. O. HURT & others *vs.* BRIEN & THAXTON & others.

October Term, 1873.

EXECUTION SALE—PROOF OF.—A purchaser at execution sale must show that a legal sale was made, either by the return of the officer, or other competent proof.

SAME—PURCHASE BY CO-DEBTOR.—A co-debtor in the judgment, who, after an arrangement between the creditor and principal debtor, with his knowledge, subsequently carried out, for the settlement of the judgment, buys land of the principal debtor sold under a previous levy, without the knowledge of the principal debtor, and merely for the costs, will hold the title as security for the costs, and, beyond that, as trustee for the principal debtor.

SAME—REDEEMING CREDITOR—A creditor, who, with full knowledge of the facts, redeems the land thus sold, will take no better title than the purchaser.

REDEMPTION—RECEIPT.—The receipt of a redeeming creditor filed with the clerk, without notice to the debtor, must contain on its face sufficient to operate as notice in law that the credit is given to him, and to enable him to redeem, otherwise the redemption will be void.

*Jno. Reid*, for complainants.

*M. M. Brien*, for defendants.

THE CHANCELLOR :—This bill was filed January 23d, 1873. The facts as relied on by complainant are in substance that John A. Payne, on the 25th of October, 1869, recovered a judgment, in the Circuit Court of Davidson County, against the complainant, Hurt, and the defendants, James Hughes and David Hughes, for $2,205 and costs $19.90. This judgment was recovered upon two notes given by complainant in part for a house and lot on Front street in Nashville, bought by him from James Hughes, who negotiated the notes to Payne. Executions issued upon this judgment and were levied upon lots Nos. 3 and 4 in Blood's speculation in the 6th ward of Nashville, the property of complainant, but too late to sell previous to the return day in January, 1870. A *venditioni exponas* was issued returnable to the May term. Complainant waived advertisement and agreed that the lots might be sold on the 7th of May, 1870, unless sooner satisfied. The complainant, whose business required his presence in another state, applied to David Hughes to pay and satisfy the judgment, which he agreed to do, and did afterwards pay the same. The agreement of Hughes, who was a man of means, was made known to the judgment-creditor and his solicitor who assented to it. Having made this arrangement, complainant left the state, and did not return to Nashville until after the 7th of May, 1870. He had no notice that the agreement was not in all respects complied with, and did not learn until October or November, 1872, that it was claimed that said lots had been sold by the sheriff and bought by James Hughes, and that defendants, Brien & Thaxton, as judgment-creditors of his, had redeemed the same. Upon examination he found that the deputy sheriff had returned the *venditioni exponas*, with the

following endorsement: "I did offer the property herein described for sale at the court-house door in Nashville on the 7th day of May, 1870, when the same was struck off to James Hughes for $23, he bidding for lot No. 3 $11 and for lot No. 4 $12, and paid money into my hands with which I paid costs. Held up as to balance, see endorsement of plaintiff's attorney." The endorsement referred to is dated the 9th of May, 1870, the deputy sheriff's return being dated May 14th, 1870. Upon further examination, it was found that Brien & Thaxton had recovered two judgments against one Owen, before P. W. Brien, a justice of the peace and a brother of M. M. Brien, the member of the firm of Brien & Thaxton, on which complainant had become stayor; that executions were issued upon these judgments and levied upon certain realty of Owen, and the papers returned to the circuit court where a judgment of condemnation of the land was rendered, that a *venditioni exponas* issued which was returned not sold for want of bidders, and no further steps seem to have been taken. It was further found that these judgments are entered upon the execution docket of the circuit court thus: "*Brien & Thaxton* v. *A. R. Owen & F. O. Hurt*," each judgment being dated April 17, 1868, one for $90.27 and $15.85 costs, and the other for $261.95 and $15.85 costs. Opposite to the first of these judgments was the following receipt in the handwriting of M. M. Brien: "Received one hundred and fifty dollars, the amount bid upon lot purchased by James Hughes, March 14, 1870, this January 8, 1872. Brien & Thaxton."

Opposite to the other judgment was this receipt: "Received one hundred and fifty dollars, amount bid upon lot purchased by Jas. Hughes, March 14, 1870, this January 8, 1872, total amount $300 for lots No. 3 and 4. See No. 8,524. Brien & Thaxton."

No. 8,524 seems to have been the number of the judgment of Payne against complainant and the Hughes on the execution docket, and opposite is the following entry made by the clerk: "Land redeemed by Brien & Thaxton, who bid

one hundred and fifty dollars on each lot upon their judgments as shown in Book R., 7,590 and 7,591, and receipt filed in this office. Amount of redemption paid twenty-three dollars and $2.50 interest. January 8, 1872. Albert Akers, clerk."

It was further found that the sheriff had conveyed lots Nos. 3 and 4 to Brien & Thaxton, reciting the sale to Hughes " to satisfy costs in the case of John A. Payne," and the redemption by Brien & Thaxton. That Brien & Thaxton had, thereupon, brought an action of ejectment against the tenants in possession of said lots, to whom complainant had rented them for the year 1872, all of whom were negroes except one, and he was only sued by his sirname, the christian name being left blank, and recovered, on the 5th of September, 1872, a judgment by default, upon which a writ of possession had been issued, and that Brien & Thaxton were in possession of said lots.

The gravamen of the bill is, that, under the agreement with David Hughes, assented to by the judgment-creditor, complainant had a right to suppose, and did suppose that the Payne judgment had been satisfied without any sale of the lots, that he had not the least notice to the contrary until after the defendants, Brien & Thaxton, had obtained possession of the lots in the action of ejectment, nor was there anything to put him on his guard against the sacrifice of his property, worth, according to the proof, from six to ten thousand dollars.

James Hughes admits in his deposition that he never gave the complainant any notice of the sale to him, or of the redemption by Brien & Thaxton. Brien & Thaxton do not pretend that they gave the complainant any notice of their claim at any time, though Brien says he procured the names of the tenants from one Turner who had at one time been the agent for Hurt in renting the lots, and Turner testifies to the same fact, but does not say that he notified Hurt of what was going on. I am satisfied from the entire record that Hurt did not know of the alleged sale and redemption,

and that he did not have actual notice of the ejectment suit, until after the defendants had taken possession of the land under their writ of possession.

The defendants, Brien & Thaxton and James Hughes, do deny in their answer, which is put in without oath, the oath being waived, that complainant made any arrangement with David Hughes, as alleged in the bill, to satisfy the Payne judgment. The Hughes make the same denial in their depositions, while the complainant re-affirms the fact in his deposition. Both of the Hughes go further, and positively deny that complainant ever, prior to the 7th of May, 1870, approached them on the subject of satisfying the judgment and relieving the land. But in this they are proved to be mistaken by the evidence of John H. Anderson and W. C. Turner, disinterested witnesses, the former a partner of David Hughes at the time, and the other having his office in Hughes' store. Both of these witnesses state positively that complainant did call upon David Hughes upon the subject of the judgment in the spring of 1870, and apply to him to take up the judgment, and prevent a sacrifice of the property. Both of them say that David Hughes expressed his sympathy for the complainant, and his belief that there was plenty of property to secure the debt, and that they understood him to say that he intended to pay it. David Hughes himself, while he states his want of recollection of the fact, admits that he was on friendly terms with Hurt at the time, that he had the means, and would have advanced them to relieve him, if the complainant had asked him. He further concedes that he did take up the judgment by joining with James Hughes in giving their notes for the amount, and that he did actually pay the notes. Both Payne and his attorney say that from conversations with the Hughes before the 7th of May, 1870, they were satisfied the judgment would be paid by them without a sale, and that it was so satisfied on the 16th of May, 1870. And the deputy sheriff, who had the *venditioni exponas* in his hands, expressly says in his deposition, that some time before the 7th

of May, 1870, he, in company with James Hughes, went to the office of Payne's attorney to have a conference in regard to the matter, " and went away fully impressed with the belief that, *through some arrangement between the parties at interest*, then pending, the sale would not be made."

Under these circumstances, and upon this testimony, it is too clear for discussion that, even if a sale was actually made on the 7th of May, 1870, at which James Hughes became the purchaser of the lots at the price of $23, he could only hold the title thus acquired for the re-imbursement of the costs actually paid, and beyond that in trust for the complainant. It is equally clear that if Brien & Thaxton had knowledge of the facts, they could stand in no better situation than Hughes. Nothing is better settled than that the purchaser of property subject to an equity, with full knowledge of the equity, takes the position of the person from whom he acquires title. *Turner* v. *Pettigrew*, 6 Hum. 438, and cases *passim*. The proof is that M. M. Brien, the senior member of the firm of Brien & Thaxton, was the attorney of James Hughes in and about this very judgment, and he admits, in his deposition, that he advised his client to bid the costs, so as to be able to advance his bid if the debt was not settled within the twenty days. I think the inference is fair, that he knew all the facts, and gave this advice to protect his client if the arrangement then agreed upon was not carried out.

Moreover, it may well be doubted whether a redeeming creditor can stand in any better situation than the creditor from whom he redeems. Certainly, a court of equity under the circumstances of this case would only permit him to hold the legal title to re-imburse him the amount actually advanced with interest, and then subject to the trust or equity of the debtor as against the original purchaser. In this view, conceding a *bona fide* redemption, the complainant would be entitled to divest the legal title out of the defendants upon payment of the $23, and $300 advance bid, with interest.

It is obvious if the defendants, Brien & Thaxton, can claim any more it is by the assertion of a legal right, and they do stand upon this supposed right and claim the " pound of flesh." They insist that there has been a valid execution-sale of the lots at which James Hughes became the purchaser, and that they redeemed from him in due course of law. This position requires that there should have been a valid sale, and a valid redemption.

In regard to the sale, the proof of the judgment-creditor and his attorney is that there was no sale on the 7th of May, 1870, and the defendant James Hughes himself positively asserted, after the filing of this bill, as he himself admits in his deposition, that there was no sale. He excuses himself by adding, that he did n't think at the time that he had bought the property at a sheriff's sale, but he found, upon reflection, that he had. The deputy sheriff thinks a sale was made, but neither he nor Hughes can state that any person was present except themselves, or any of the circumstances necessary to constitute a valid sale. We are driven, therefore, to the return of the officer itself, already quoted, and when we look to that we find that he does not say the lot was offered " at public sale " or outcry, or that Hughes was the last, highest, and best bidder. He merely says that he offered the property for sale at the court-house door, and it was struck off to Hughes for $23, he bidding so much on each lot. It is true that the rights of the purchaser do not, ordinarily, depend on the sheriff's return. *Mitchell* v. *Lipe*, 8 Yer. 179 ; *Lea* v. *Maxwell*, 1 Head, 368. It is enough if he had authority and did make the sale. But here, it is not shown by the return, or by the evidence, that there was a legal sale. On the contrary, the impression left upon the mind, by the facts and circumstances, is that there was no actual public sale, but a mere understanding between the deputy sheriff and Hughes that he should be understood as bidding the costs, and this seems to have been done at the instance of the deputy sheriff for his own protection, the parties not having actually satisfied

the judgment at the time, there being only an understanding that it would be satisfied, and it was satisfied by Hughes on the 16th of May, thereafter. The defendants have failed to show a valid sale.

Nor, when you come to look to the evidence relied on, is the redemption satisfactorily made out. The only evidence relied on is the memorandum of the clerk, and the receipts already copied. The memorandum is, of course, not sufficient. There is no law requiring it, or making it evidence. To constitute a good redemption by a judgment-creditor, he must, in addition to paying the holder his bid, etc., "pay to the debtor, or credit his debt with a sum equal to ten per cent. or more on the sum bid at the original sale, or with a sum equal to ten per cent. or more upon the judgment of said creditor, at the election of said creditor." Act of 1859–60, ch. 84. There was, in this case, no payment to the debtor, and the validity of the act must depend upon the fact whether the debt was properly credited. The law, it need scarcely be said, exacts strict compliance with the terms of the statute, otherwise the right to redeem is not acquired. *Hill* v. *Walker*, 6 Cold. 428, and cases cited. The credit must be given by some positive act. Id. In what form the credit shall be given is not prescribed by the code. But if it be conceded, as intimated in *Hill* v. *Walker*, that the credit may be given as prescribed by the Code, § 2127, for an advance on a bid, "by depositing a receipt therefor with the clerk of the court in which the judgment was rendered," and if it be conceded that the judgments were rendered in this case within the meaning of the law in the circuit court, yet, it is obvious, that the receipt, in the absence of personal notice to the debtor, should contain on its face sufficient to give him notice *in law* that the credit is received from, or given to him. If the creditor chooses to act in secret, and follow the letter not the spirit of the law, he must abide by the letter, and take his "pound of flesh," but shed not one drop of Christian blood. Now, in this case, the receipts do not show from whom the amount

credited is received, or to whom given. They merely say : "Received $150, the amount bid upon lot purchased by James Hughes." The name of F. O. Hurt nowhere appears in it, and no one merely looking to the receipt could say that the credit was from Hurt, and not from Owen. Moreover, both receipts describe the lot as purchased by James Hughes on the 14th *of March*, 1870, when the lots now in controversy, if bought by Hughes at all, were bought on the 7th of May, 1870. So that, even Hurt himself, if he had read the receipt, would not have known that the credit was for the lots in controversy as sold on the 7th of May, 1870. The credits are, moreover, void for uncertainty. Each is for $150 on a separate judgment without specifying the lot. But, upon reference to the judgments, it will be seen that the whole amount due upon the first of them, principal and interest, will fall short of the credit by about $25. One of the lots, therefore, is subject to redemption by paying, or offering to pay, less than the $150 credit, but which one does not appear, and cannot be ascertained.

If there had been actual notice to the debtor, some of these objections might have little weight, but, in the absence of notice, all of them are overwhelming.

The complainant is entitled to a decree setting aside the judgment in ejectment at law, divesting title to lots Nos. 3 and 4 out of the defendants and vesting it in him, and ordering an account for rents since the property has been in the possession of defendants, but upon the amount found due against them for rents, the defendants will be entitled to a credit for the $23, costs and interest. The defendants will pay all the costs.